## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VALERIE SUE HALLSTROM,** | : | **Civil No. 1:14-CV-2485** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

This is an action brought under 42 U.S.C. 405(g), seeking judicial review of the final decision of the Commissioner of Social Security's final decision denying Valerie Sue Hallstrom's applications for disability insurance benefits under the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil Procedure.

This social security disability claim presented the Administrative Law Judge (ALJ) with a complex, and often contradictory, set of facts. Ms. Hallstrom, a high school graduate in her mid-40s, premised her disability claim upon an array of alleged "impairments: obesity, status post right ulnar surgery, arthritis, history of hairline fracture of left knee, anxiety disorder, adjustment reaction with mixed emotional

features, degenerative disc disease/degenerative joint disease of cervical spine, status-post surgery, and depression." (Tr. 29.)[1] With respect to this constellation of alleged impairments the ALJ was called upon to examine the opinions of at least eight different sources. These opining sources included medical and non-medical sources, and both treating and non-examining consultative experts. Furthermore, even among these various sources there were internal contradictions and disputes regarding the degree of Hallstrom's limitations.

These various opining sources, in turn, were commenting upon an extensive, but equivocal, medical record. That medical record reflected both numerous episodes requiring treatment, and many positive reports of Hallstrom's response to that treatment. Furthermore, the ALJ was required to assess these various opinions, and examine this treatment record, against the backdrop of Hallstrom's activities of daily living, activities which demosnrtated some capacity to work.

Ultimately, after a careful weighing of this evidence, including an individualized assessment of the various opinions submitted in this case, the ALJ fashioned a highly restrictive residual functional capacity for Hallstrom, and

---

[1]While Ms. Hallstrom's initial disability application entailed both physical and emotional impairments, in this appeal she does not challenge the ALJ rulings relating to her emotional condition. Thus, we are only called upon to assess the ALJ's treatment of her physical limitations in this appeal.

determined based upon vocational expert testimony that even with the battery of restrictions imposed by Hallstrom's impairments there were still positions in the national and regional economy which she could fill. This finding, in turn, led to a determination that Hallstrom was not disabled, a determination which Hallstrom challenges in the instant case.

Finding that this determination was supported by substantial evidence which was articulated on the record in these proceedings, for the reasons set forth below, the Commissioner's determination will be affirmed.

## II.   BACKGROUND AND PROCEDURAL HISTORY

### A.   HALLSTROM'S MEDICAL HISTORY

Valerie Hallstrom initially applied for Social Security Disability Insurance Benefits ("SSD") and Supplemental Security Income ("SSI") on March 21, 2012, alleging disability since January 1, 2007. (Tr. 144-153, 193.) At the time of this application, Hallstrom was a woman in her 40's with a high-school education, (Tr. 144, 156, 182), who had previously worked as a retail manager for 17 years. (Tr. 40, 173.) As the ALJ later noted, Hallstrom's disability application was based upon her claim that she suffered from the following severe "impairments: obesity, status post right ulnar surgery, arthritis, history of hairline fracture of left knee, anxiety disorder, adjustment reaction with mixed emotional features, degenerative disc

disease/degenerative joint disease of cervical spine, status-post surgery, and depression." (Tr. 29.)

With respect to these ailments, the relevant medical records showed that Hallstrom had been treated by a number of care givers for several different conditions between 2010 and 2013. At the outset, in August of 2010, Hallstrom sought treatment after she fell at Wal-Mart. (Tr. 391.) Hallstrom's treating physician on this occasion, Dr. Mark Perlmutter, an orthopedic surgeon, diagnosed derangement of the medial meniscus of the left knee, sprain/strain of the right shoulder, and effusion of the shoulder and knee joints. (Tr. 393.) On September 1, 2010, Hallstrom underwent an MRI of her left knee, which showed a hairline longitudinal fracture of the tibia with extensive surrounding edema. (Tr. 400.). One month later, on October 1, 2010, Hallstrom underwent a CT scan of her left knee, which showed evidence of healing and no definite fracture line visible in the anterior aspect of the upper end of the tibia. (Tr. 398.) By October 5, 2010, Dr. Perlmutter reported that Ms. Hallstrom's left knee pain and effusion were improving, (Tr. 384), and she appeared to walk with a normal gait without any assistive devices. (Tr. 385.)

One month later Ms. Hallstrom was seen for another medical concern. On November 18, 2010, she sought treatment from Dr. Perlmutter for pain in both upper extremities with repetitive motion, gripping, twisting, pushing-pulling, lifting over the

shoulder, and cold/damp conditions. (Tr. 380.) On this occasion, however, a physical examination of Hallstrom was essentially normal, with full strength, range of motion, and stability. (Tr. 382.)

A year then passed, until November of 2011, when Hallstrom sought treatment from Jonathan R. Slotkin, M.D., a neurosurgeon, for pain in her neck and left upper extremity. (Tr. 539.) While Dr. Slotkin reported that Hallstrom walked with a normal gait, her strength was 5/5 in all muscle groups of all extremities, and her sensory and vascular examinations were normal, he also found that her cervical range of motion was somewhat pain limited,(Tr. 539), and an MRI of Hallstrom's cervical spine showed some disc herniations. (Tr. 539.) Therefore, Dr. Slotkin recommended surgery. (Tr. 540.) Hallstrom accepted this advice and underwent anterior cervical discectomy and fusion surgery in late November, 2011. At a follow up visit on December 12, 2011, Dr. Slotkin reported that Hallstrom had marked improvement in her preoperative symptoms . (Tr. 523.) He prescribed four weeks of postoperative physical therapy. (Tr. 523).

Much of Hallstrom's follow up care and treatment was then provided by physician assistants or physical therapists. Thus, on December 19, 2011, Hallstrom saw Physician Assistant Timothy Swift for a follow up appointment. (Tr. 520.) At that time she reported that she was doing well, her numbness and tingling had resolved,

she was experiencing no fatigue, but she was having difficulty breathing at times, and she still had pain between her shoulder blades. (Tr. 520.) Physician Assistant Swift reported that Hallstrom had no pain, redness, or swelling in the joints of her extremities and prescribed Flexeril, a muscle relaxant. (Tr. 521.)

When Hallstrom saw the physician assistant again some four months later, on March 19, 2012, Physician Assistant Swift reported that she was doing well and was planning to apply for disability benefits. (Tr. 486.) Hallstrom's condition reportedly had steadily improved since her surgery, and she had recently started exercising in an effort to lose weight. (Tr. 486, 489.) Nonetheless, Hallstrom complained of pain in her fingers, and Swift diagnosed osteoarthritis. (Tr. 486-8, 506-8.)

On January 10, 2013, Hallstrom saw Physician Assistant Caitlin Davenport, for a six-month follow up appointment. (Tr. 1022.) At that time Hallstrom complained of some strength issues in her neck, but noted a 50% decrease in her pre-operative pain. (Tr. 1022.) X-rays showed that Hallstrom's cervical spine fusion was progressing, but was not yet complete. (Tr. 1022.) Davenport advised Hallstrom to follow up in one year to gauge the progress of her cervical fusion. (Tr. 1022.)

Several months later, on April 19, 2013, Hallstrom met with Dr. Alfred E. Denio, III, a rheumatologist. At that time, an examination of Hallstrom revealed that the only significant musculoskeletal findings were restricted cervical motion of right

and left rotation to 45 degrees, and discomfort, but no loss of motion, in the right knee. (Tr. 1059.)

These medical findings, which revealed both medical problems and progress for Hallstrom, were also reflected in the opinions of various medical sources in these disability proceedings.  For her part, Hallstrom presented opinions from three sources who had been involved in her care and treatment. Two of these sources were physician assistants, professionals who are not regarded as qualified medical sources under social security regulations. (Tr. 968-975, 983-990.) These physician assistants opined that Hallstrom could not perform sustained work, while reaching somewhat different conclusions regarding the nature, scope and extent of her limitations. In addition, one treating physician, Dr. Slotkin, partially completed a medical source opinion statements. (Tr. 978-980.) However, Dr. Slotkin declined to provide an opinion on the issues which was most pertinent to Hallstrom's claim of disability, the limitations on her ability to stand, sit, walk lift and carry, deferring instead to Hallstrom's physical therapists on these issues. (Id.)  In contrast, as many as five non-examining doctors reviewed Hallstrom's medical history and opined that she could perform light work with some limitations despite her physical and emotional impairments. (Tr. 89-90, 364-70, 407-13, 414-26, 921-31.)

Like the medical opinion evidence, Ms. Hallstrom's own direct statements

concerning her impairments were at times in conflict. Thus, while Ms. Hallstrom testified to the disabling effect of her limitations, (Tr. 61-77), her reported activities of daily living included washing dishes, making some simple meals, doing laundry, vacuuming once in a while, going out daily to sit on the porch, shopping for groceries once a week, handling money, and watching television. (Tr. 68-9.) Moreover, medical records revealed that, with respect to one of her presenting complaints, chronic fatigue, Hallstrom in the past had consistently denied complaints of fatigue to her treatment providers. (Tr. 464, 467, 470, 473, 475, 478, 484, 486, 490, 497, 506, 510, 513, 517, 520.)

It was against this medical background that the ALJ conducted an assessment of Hallstrom's disability claim.

### B.    PROCEEDINGS BEFORE THE ALJ

Hallstrom's claims were initially administratively denied on July 17, 2012.  On August 28, 2012, Hallstrom filed a written request for an administrative hearing. (Tr. 111-122.)  That hearing was then scheduled on September 5, 2013. At this hearing, both Hallstrom and a vocational expert appeared and testified. (Tr. 51-84.)

After hearing from Ms. Hallstrom regarding her limitations, and weighing the competing and conflicting medical evidence, the ALJ presented the vocational expert with a carefully tailored, and highly restrictive residual functional capacity

8

hypothetical, asking the vocational expert to assume an individual of Plaintiff's age, education and work experience who had the residual functional capacity to perform light work with:

> no more than occasional postural maneuvers such as balancing, stooping, kneeling, crouching and climbing on ramps and stairs, but must avoid occupations that require climbing on ladders, ropes and scaffolds or crawling. She must avoid occupations that require pushing and pulling with the upper right dominant extremity and no more than occasional pushing and pulling with the left upper extremity, both to include the operation of hand levers. Further, she would be limited to no more than occasional overhead reaching with both upper extremities. She must also avoid concentrated exposure to temperature extremes, excessive noise, vibration or extreme dampness and humidity. She would be limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights. And she would be limited to occupations requiring no more than simple, routine tasks not performed in a fast-paced production environment involving only simple, work-related decisions and, in general, relatively few workplace changes.

(Tr. 78-79).

In response to this hypothetical, the vocational expert testified that such an individual could not perform Hallstrom's past job but could perform light, unskilled jobs such as cashier II, garment sorter, and gate tender. (Tr. 79-80.) The ALJ then asked a series of follow-up hypothetical questions. In response to these follow-up questions the vocational expert testified that if Hallstrom was additionally limited to no more than occasional fine fingering with the right upper extremity, all three jobs would remain viable. Further, the vocational expert stated that if she was also limited

to no more than occasional gross handling with the right upper extremity, all three

jobs would remain as employment options for Hallstrom. (Tr. 81.)

The vocational expert also testified that Hallstrom could perform a significant

number of jobs in the national economy even if she was limited to sedentary work.

(Tr. 81-82.) Indeed, in the course of the hearing, the ALJ presented the vocational

expert with no less than five hypotheticals concerning the possible limitations

confronting Hallstrom. (Tr. 78-82.) In four of these five hypothetical scenarios, the

vocational expert testified that there were positions available for Hallstrom in the

national and regional economies. (Id.)

Following this hearing, the ALJ denied Hallstrom's claims in a 19-page written

decision dated January 6, 2014. (Tr. 23-42.) In this decision denying Hallstrom's

applications for benefits, the ALJ determined that Plaintiff met the insured status

requirements of the Act only through June 30, 2012, then proceeded through each step

of the five-step sequential evaluation process.  (Tr. 29.)  At step one the ALJ found

that Hallstrom had not engaged in substantial gainful activity since 2007, the alleged

onset date of her disabilities.  (Id.)  At step two the ALJ found that Hallstrom suffered

from the following severe "impairments: obesity, status post right ulnar surgery,

arthritis, history of hairline fracture of left knee, anxiety disorder, adjustment reaction

with mixed emotional features, degenerative disc disease/degenerative joint disease

of cervical spine, status-post surgery, and depression." (Tr. 29.)  At step three the ALJ

concluded that Hallstrom did not have any impairment or combination of impairments

that met or medically equaled the severity of one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1.  (Admin Tr. 31-21.)

Before proceeding to steps four and five, the ALJ assessed Hallstrom's residual

functional capacity, or RFC. In making this assessment, the ALJ carefully considered

Hallstrom's alleged limitations, and fashioned an RFC which incorporated many of

these limitations by restricting Hallstrom to light work that required no pushing and

pulling with the dominant right upper extremity; no more than occasional gross

handling with the right upper extremity; no more than occasional pushing and pulling

with the left upper extremity; and no more than occasional overhead reaching with

both upper extremities. (Tr. 33.) In this RFC the ALJ also accounted for the

limitations caused by Hallstrom's arthritis and history of right ulnar surgery by

limiting her to occupations that required no more than occasional fine fingering with

the upper right extremity, including prolonged writing or keyboard work. The ALJ

then addressed Hallstrom's history of hairline fracture of the left knee and obesity by

limiting her to jobs that required no more than occasional postural maneuvers, such

as balancing, kneeling, crouching, and climbing of ramps and stairs; and no climbing

on ladders, ropes, scaffolds, or crawling. Finally, the ALJ  accounted for Hallstrom's

environmental limitations by restricting her to workplaces requiring no concentrated prolonged exposure to temperature extremes, excessive noise, vibration, extreme dampness and humidity, and no exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 33.)

In fashioning this RFC assessment for Hallstrom the ALJ also individually examined and considered eight different source opinions. (Tr. 38-39.) These opinions came from both treating and non-treating sources, and were provided both by qualified medical sources, i.e., doctors, and by non-qualified medical sources, physician assistants. A review of the ALJ's opinion reveals that each of these opinions was individually considered on its merits, and each was assigned a weight by the ALJ based upon an assessment of the opinion, the qualifications of the source, the degree to which the opining source had prior direct experience with Hallstrom, and the extent to which the opining source's statements comported with other objective medical evidence. (Id.)

At step four the ALJ considered whether, based on this RFC, Hallstrom could perform her past relevant work, and consistent with the vocational expert's opinion found that she could not perform this prior work. (Tr. 40.) Finally, at step five the ALJ considered whether, based on the above RFC considered together with the vocational factors of age, education, and work experience, Hallstrom could perform other work

12

which existed in the national economy.  Once again, relying upon the vocational

expert's testimony responding to the five separate hypotheticals posed by the ALJ, the

ALJ found that Hallstrom could do "other work" that existed in "significant numbers"

in the national economy, and concluded that she was not disabled. (Tr. 40-42.)

Hallstrom sought Appeals Council review the ALJ's decision denying her

claims. The Appeals Council denied this request for review, and the instant appeal

followed. (Doc. 1.)

### C.   THE INSTANT APPEAL

On appeal, Hallstrom alleges that the ALJ's decision denying her claim for

benefits is not in accordance with the law, or supported by substantial evidence. (Doc.

1). In this regard, Hallstrom argues that the ALJ erred in concluding that she could

perform light work with a series of additional restrictions, and specifically contends

that the ALJ failed to fully account for the opinion evidence of the treating physicians

and physician  assistants. Hallstrom also asserts that the ALJ's decision did not

adequately address her subjective complaints of pain, and neglected to fully consider

some positional limitations that Hallstrom might experience. (Doc. 7.) The

Commissioner has responded to these claims, arguing that the ALJ's decision is in

accordance with the law and is supported by substantial evidence.  (Doc. 8.)

According to the Commissioner, the ALJ properly weighed the expert opinions,

correctly assessed the subjective evidence of pain, and took into account all of Hallstrom's credibly determined limitations. (Id.) This matter, therefore, is fully briefed by the parties, and is now ripe for disposition.

For the reasons set forth below, the decision of the Commissioner will be affirmed.

### III.   DISCUSSION

#### A.   STANDARDS OF REVIEW–THE ROLES OF THE ADMINISTRATIVE LAW JUDGE AND THIS COURT

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators – the ALJ and this court.  At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).

To satisfy this requirement, a claimant must have a severe physical or mental

impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). Additionally, to receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.   42 U.S.C. §423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a).   Under this framework, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §§404.1520, 416.920(a). Between steps three and four, the ALJ must also assess a claimant's RFC.   RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1545, 416.945.   In making

15

this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545, 416.945.

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §423(d)(5);  42 U.S.C. §1382c(a)(3)(H)(incorporating 42 U.S.C. §423(d)(5) by reference);   20 C.F.R. §§404.1512, 416.912; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  When this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

Once a final decision is issued by the Commissioner, and that decision is appealed to this Court, our review of the Commissioner's final decision is limited to determining whether the findings of the final decision maker – the ALJ in this case – are supported by substantial evidence in the record as it was developed before that decision maker.   See  42  U.S.C.  §405(g)(sentence  five);  42  U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200(3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533,

536(M.D.Pa. 2012). The "substantial evidence" standard of review prescribed by statute is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-

17

02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . ."). Moreover, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

Furthermore, it is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

###### B.     GUIDELINES FOR THE ASSESSMENT OF THE CREDIBILITY OF A CLAIMANT'S ALLEGATIONS ABOUT HER SYMPTOMS AND LIMITATIONS

Further, an ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness' demeanor and credibility. <u>Frazier v. Apfel</u>, No. 99–CV–715, 2000 WL 288246, at *9 (E.D.Pa. Mar. 7, 2000) (<u>quoting Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531(6th Cir.1997)). In making a finding about the credibility of a claimant's statements, the ALJ need not totally accept or totally reject the individual's statements. SSR 96–7p. The ALJ may find all, some, or none of the claimant's allegations to be credible, or may find a claimant's statements about the extent of his or her functional limitations to be credible but not to the degree alleged. <u>Id</u>.

The regulations describe a two-step process  20 C.F.R. §404.1529.  First, the ALJ must consider whether the claimant has met his or her burden of showing that he or she has a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms alleged.  Once an underlying impairment has been shown, the ALJ reaches the second step of this process.  At the second step the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186 at *2. "Whenever the individual's statements abut the intensity, persistence, or functionally

limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on the consideration of the entire case record." Id.  In doing so, the ALJ must consider the following seven factors outlined in 20 C.F.R. §404.1529(c)(3): (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or symptoms; (3) precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms that are brought to the ALJ's attention.   20 C.F.R. 404.1529(c)(3); SSR 96-7p, 1996 WL 374186 at*3.

### C.   LEGAL BENCHMARKS FOR THE ALJ'S ASSESSMENT OF MEDICAL OPINION EVIDENCE

The Commissioner's regulations also speak to the way in which medical opinions should be assessed. Those regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a

claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions.   20 C.F.R. §404.1527(a)(2).[2]  Regardless of its source, the ALJ is required to evaluate every medical opinion received.  20 C.F.R. §404.1527(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c).  "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  SSR 96-6p, 1996 WL 374180 at *2.  Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight.  See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source).  Under some circumstances, the medical opinion of a

---

[2]Medical source opinions on issues that are dispositive of a case, e.g., whether a claimant is disabled, are reserved to the Commissioner and do not constitute medical opinions defined by 20 C.F.R. §404.1527(a)(2).   20 C.F.R. §404.1527(d). Furthermore, where a medical source opines that an individual is limited to "sedentary" work, or makes similar statements that appear to use terms set out in the Commissioner's regulations, the adjudicator must not assume that the medical source using the terms "sedentary" and "light" is aware of the Commissioner's definitions. SSR 96-5p, 1996 WL 374183 at *5.  Such opinions must never be ignored, and must be considered based on the applicable factors in 20 C.F.R. §404.1527(c).  SSR 96-5p, 1996 WL 374183 at *3.  However, medical opinions on case dispositive issues like these are never entitled to controlling weight under 20 C.F.R. §404.1527(c)(2).  See 20 C.F.R. §404.1527(d)(3); SSR 96-5p, 1996 WL 374183 at *2.

treating source may even be entitled to controlling weight.   20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. §404.1527(c).

At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators.  See SSR 96-5p, 1996 WL 374183 at *4.  As such, they do not express opinions; they make findings of fact that become part of the determination.  Id.  However, 20 C.F.R. §404.1527(e) provides that at the ALJ and Appeals Council levels of the administrative review process, findings by

nonexamining State agency medical and psychological consultants should be evaluated as medical opinion evidence. As such, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and psychologists and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by State agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining State agency medical or psychological consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3.

However, it is also well-settled that acceptable medical sources do not include physician assistants. Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir.2008). Rather, these medical source rules only apply to physicians, and where a disability claimant's application is supported by statements from physician assistants, this rule does not control. Instead, the ALJ should consider the physician assistant's opinion as some "other source" opinion, which should be assessed, but not given controlling weight. Applying these legal guideposts, it has been held that an ALJ may properly elect to follow the consultative opinion of a non-examining physician who reviews a claimant's medical records over treating physician assistant opinions, provided the ALJ adequately explains the grounds for this determination. See e.g., Weaver v.

Astrue, 353 F. App'x 151, 152 (10th Cir.2009); Hearn v. Colvin, No. 3:13-CV-1229,

2014 WL 4793954, at *10-11 (M.D. Pa. Sept. 24, 2014); Wade v. Colvin, No.

13–CV–135, 2014 WL 1015719 (D.Co.2014).

> **D.** **OTHER PROCEDURAL AND SUBSTANTIVE REQUISITES FOR AN ALJ RULING–PROPER HYPOTHETICAL QUESTIONS FOR VOCATIONAL EXPERTS**

Finally, since one of the principal contested issues in this setting often relates

to the claimant's residual capacity for work in the national economy, an ALJ must

exercise care when formulating proper hypothetical questions to vocational experts

who opine on the availability of work for a particular claimant and assessing that VE

testimony. In this regard, the controlling legal standards are clear, and clearly defined.

As the United States Court of Appeals for the Third Circuit has observed:

> Discussing hypothetical questions posed to vocational experts, we have said that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Podedworny, 745 F.2d at 218. A hypothetical question posed to a vocational expert "must reflect *all* of a claimant's impairments." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987) (emphasis added). Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence. Podedworny, 745 F.2d at 218 (citing Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir.1983)).

Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002).

The formulation of a proper hypothetical question has a dual significance in social security proceedings. First, as an evidentiary matter, it determines whether the vocational expert's opinion can be considered as substantial evidence supporting an ALJ finding. Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)("Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence.") In addition, an erroneous or inadequate hypothetical question undermines the reliability of any residual function capacity determination since " objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." Rutherford v. Barnhart, 399 F.3d 546, 554 n. 8 (3d Cir. 2005). However, it is also well-settled that a hypothetical does not need to address every conceivable limitation suggested by a claimant. Rather the "ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations* (see Plummer, 186 F.3d at 431)." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)(emphasis in original).

### E.   SUBSTANTIAL EVIDENCE SUPPORTED THE ALJ'S DECISION

In this case, the ALJ was presented with a mixed and equivocal picture regarding the plaintiff's emotional and physical limitations. Hallstrom's medical

records revealed both problems and progress in her treatment. The opinion evidence was mixed, and contradictory, and came from an array of source, including some sources–physician assistants–who are not accepted medical opinion sources under social security regulations. Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir.2008). Furthermore, Hallstrom's subjectve complaints were in some instances at odds with her treatment records, and her activities of daily living.

Given the conflicts in the evidence presented to the ALJ, we conclude that the ALJ appropriately addressed these factual questions and substantial evidence supported the disability determination made in this case. At the outset, we find that the ALJ carefully sifted through the treatment records and medical opinion testimony. On this score, while the ALJ correctly noted that physician assistants are not accepted medical sources, the ALJ did not reject the statements of these sources out of hand. Instead, the ALJ thoroughly, and individually, assessed all opinion evidence, including the statements of the physician assistants,  taking into account the opining sources treatment background with Hallstrom, and the extent to which source opinions corresponded with medical records. (Tr. 38-40.) This sort of individualized assessment is what social security regulation call upon an ALJ to do, and we perceive no error in the conduct of this assessment of the competing opinion evidence which undermines a finding that substantial evidence supported the ALJ's ultimate conclusions. In

particular, we find that the ALJ accorded proper weight to the opinions provided by physician assistants, recognizing that these opinions deserved weight and careful consideration even though the physician assistants do not qualify as medical sources under the agency's own regulations. The ALJ then weighed and assessed these opinions, but ultimately found them less persuasive than other medical opinion evidence. In this regard, the ALJ was entitled follow the consultative opinion of non-examining physicians who review a claimant's medical records over treating physician assistant opinions. See e.g., Weaver v. Astrue, 353 F. App'x 151, 152 (10th Cir.2009); Hearn v. Colvin, No. 3:13-CV-1229, 2014 WL 4793954, at *10-11 (M.D. Pa. Sept. 24, 2014); Wade v. Colvin, No. 13–CV–135, 2014 WL 1015719 (D.Co.2014). Therefore, the ALJ did not err in this aspect of the disability assessment in Hallstrom's case.

Likewise, the ALJ's treatment of Hallstrom's subjective complaints was thorough and comprehensive. (Tr. 37-40.) The ALJ considered Hallstrom's claimed limitations, and examined those limitations in light of Hallstrom's reported activities of daily living. The ALJ also took into account objective medical reports, and an array of medical opinions before determining that Hallstrom retained an extremely limited capacity for work. Furthermore, in fashioning this residual functional capacity the ALJ adopted many of the limitations described by Hallstrom, and incorporated those

limitations into five separate hypothetical questions posed to the vocational expert. The result of this careful analysis led to the ALJ to conclude that Hallstrom could perform a limited set of jobs in the national and regional economy.

In making this credibility determination: "[a]lthough the ALJ must give Plaintiff's subjective complaints of pain serious consideration, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir.2002), the ALJ may reject a claimant's complaints if he does not find them credible. Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 433 (3d Cir.1999)." Powell v. Barnhart, 437 F. Supp. 2d 340, 342 (E.D. Pa. 2006). In this regard, "[t]he ALJ 'has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible.' Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir.1974)." Timmons v. Colvin, 6 F. Supp. 3d 522, 533-34 (D. Del. 2013). Indeed, an ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness' demeanor and credibility. Frazier v. Apfel, No. 99–CV–715, 2000 WL 288246, at *9 (E.D.Pa. Mar. 7, 2000) (quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531(6th Cir.1997)).  In this case, we find that the ALJ's opinion fully and sufficiently addressed these subjective complaints in a manner which draws support from substantial evidence in the record of these proceedings. Therefore, we will not disturb these findings on appeal.

Finally, we conclude that the ALJ correctly framed a VE hypothetical question around the limitations that were established by the credible evidence which was then before the ALJ, and did not err by neglecting to specifically address any positional limitations claimed by Hallstrom. While the plaintiff complains that the ALJ did not take into account all of her claimed limitations when developing an RFC or framing questions for the VE,  "ALJ must [only] accurately convey to the vocational expert all of a claimant's *credibly established limitations* (see <u>Plummer</u>, 186 F.3d at 431)." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005)(emphasis in original). Here, we believe that the ALJ sufficiently fulfilled this responsibility by making appropriate credibility determinations and then posing an array of five separate hypotheticals questions to the VE, hypothetical questions which  aptly encompassed all of the credibly proven limitations claimed by Hallstrom.

In short, these rulings by the ALJ pertaining to this claim did not constitute an abuse of discretion. Rather, they reflected the informed exercise of judgment and discretion in the fact-finding process on a factual record which was mixed, complex, contradictory and equivocal. Recognizing that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999)," <u>Johnson</u>, 529 F.3d at 200; and consists of less than

a preponderance of the evidence but more than a mere scintilla of proof, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); we conclude that there was substantial evidence which supported the ALJ findings in this case. Therefore, those findings should not be disturbed on appeal.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, IT IS ORDERED that the Commissioner's decision is upheld, and the clerk is directed enter judgment for the defendant and close this case. An appropriate order will follow.

So ordered this 20th day of June, 2016.


<u>*S/Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge